**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| GARLAND SCHUBERT, ) | |
| ) | CASE NO. 1:13CV1300 |
| Plaintiff, ) | |
| ) | |
| v. ) | JUDGE SARA LIOI |
| ) | |
| ) | MAGISTRATE JUDGE GREG WHITE |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social ) | |
| Security, ) | **REPORT & RECOMMENDATION** |
| ) | |
| Defendant. ) | |

Plaintiff Garland Schubert ("Schubert") challenges the final decision of the Acting Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying his claim for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i) & 423 *et seq.* This matter is before the Court pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be AFFIRMED.

**I. Procedural History**

On February 23, 2011, Schubert filed an application for POD and DIB, alleging a disability onset date of September 30, 2006 and claiming he was disabled due to degenerative disc disease, high blood pressure, and panic attacks. (Tr. 139, 155.) His application was denied both initially and upon reconsideration.

On February 9, 2012, an Administrative Law Judge ("ALJ") held a hearing during which Schubert, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 29-

72.) On March 8, 2012, the ALJ found Schubert was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  (Tr. 17-24.)  The ALJ's decision became final when the Appeals Council denied further review.  (Tr. 1-3.)

## II.  Evidence

*Personal and Vocational Evidence*

Age fifty-three (53) at the time of his date last insured, Schubert was a "person closely approaching advanced age" under social security regulations.  *See* 20 C.F.R. § 404.1563(d) & 416.963 (d).  (Tr. 23.)  He has a high school education and past relevant work as an auto dealer manager and an auto sales person.  (Tr. 22-23.)

*Relevant Medical Evidence*[1]

Schubert presented to John Collis, M.D., in March 1997, complaining of low back pain.  (Tr. 197.)  Dr. Collis diagnosed lumbosacral sprain and diffuse osteoarthritic changes.  (Tr. 178.)  He advised conservative care, including a lumbosacral brace when in pain, over-the-counter anti-inflammatory medications, and chiropractic care and exercises.  (Tr. 178.)  In September 1997, Schubert underwent an MRI of the lumbar spine.  (Tr. 180.)  This MRI showed disc dehydrations and bulges at multiple levels; narrowing of the neural foramina at the L3/4 level; and, possible impingement on the exiting right L3 nerve root.  (Tr. 180.)

Schubert does not appear to have returned to Dr. Collis until nearly three years later, in July 2000.  (Tr. 182.)  He complained of "lower lumbar spine pain which he describes as a hot burning sensation which is increased over the past year."  *Id*.  Schubert further indicated he had weekly episodes of pain that "will often take a few days to subside."  *Id*.  He reported that standing seemed to be the worst position, and "walking, sitting and sleeping are okay."  *Id*.  Dr. Collis found "all five lumbar discs are degenerated but fortunately there are no herniations."  (Tr. 184.)  He recommended cortisone injections, which Schubert received on August 1, 2000.  (Tr.

---

[1] The medical record contains evidence regarding Schubert's treatment for hypertension, depression, and anxiety.  The ALJ found these conditions to be non-severe, and Schubert does not challenge that finding.  Accordingly, the Court will not recount the medical evidence regarding these conditions.

2

184-185.)

Schubert appears to have next returned to Dr. Collis at some point in September or October 2001. (Tr. 282-283.) During that visit, he complained of occasional low back pain, as well as "tightness and spasms" in his thoracic paraspinal area which caused pain "almost every day." (Tr. 282.) Dr. Collis diagnosed "thoracolumbar sprain, probably; may be a disc herniation in either the upper lumbar or lower thoracic areas." (Tr. 283.) In October 2001, Schubert underwent MRIs of his thoracic and lumbar spine. (Tr. 278-279.) The MRI of his thoracic spine showed "mild narrowing and dehydration of thoracic discs at multiple levels," but "[n]o evidence of herniation or impingement of the dural sac or cord." (Tr. 278.) The MRI of his lumbar spine showed the following: multilevel disc disease; L1-2 bulging disc; mild grade I retrolisthesis of L2 on L3 with minimal ventral impression on dural sac; L3-4 right paramedian/right lateral hernation impinging the epidural and perineural fat; L5-S1 central/right paramedian herniation impinging the epidural and perineural fat. (Tr. 279.)

The parties do not direct the Court's attention to any evidence in the record indicating Schubert received medical treatment for his back pain during either the remainder of 2001 or 2002. In March 2003, Schubert established care with primary physician Michael Silverman, M.D. (Tr. 326.) In treatment notes dated March 21, 2003, Dr. Silverman stated Schubert has "chronic stiff LB-DJD. Had to give up truck driving." (Tr. 326.) In October 2004, Dr. Silverman noted "mild LBP– see Rheumatologist Epstein." (Tr. 322.) Although Schubert presented to Dr. Silverman regularly between 2003 and 2009, the parties do not direct the Court's attention to any other notations in Dr. Silverman's treatment notes during this time period indicating Schubert complained of back pain. In March 2010, however, Schubert reported neck pain and Dr. Silverman ordered an x-ray of Schubert's cervical spine. (Tr. 297, 363.) This x-ray showed reversal of the cervical lordosis; narrowing of C6/C7 disc space; and, spurs off of C6. (Tr. 363.)

In June 2005, Schubert presented to rheumatologist Howard Epstein, M.D. (Tr. 193-195.) During this visit, Schubert reported occasional morning stiffness in the S1 area, stating that it "takes about an hour to improve when it is present" and "doesn't recur when seated." (Tr.

3

193.) He rated his lower back pain that day as a 1 on a scale of 10. (Tr. 194.) In addition, Schubert stated he took an occasional Voltaren as needed and had taken "maybe 30 in the past 16 months." *Id*. Dr. Epstein diagnosed "inflam spondylopathy NOS" and advised Schubert to continue taking Voltaren and return in a year. (Tr. 193-194.)

Schubert subsequently began treatment at Broadview Back Clinic under the care of Nigel Brayer, M.D., in May 2006. (Tr. 250-252.) The record indicates Schubert presented to Dr. Brayer four times in 2006; seven times in 2007; three times in 2009; and, three times in 2010. (Tr. 202-252.) It does not appear Schubert presented to Dr. Brayer at any point in 2008. During his visits at the back clinic, Schubert received conservative care, including manipulation, electric stimulation, and therapeutic exercises. *Id*. By 2009, Schubert was reporting some improvement and increased capacity for certain activities, such as extended computer use and carrying grocery bags. (Tr. 214-215, 217.) Treatment notes from 2010 also indicate improvement, as well as increased capacity for stair climbing and bending. (Tr. 208-209, 205-206.)

The record also indicates Schubert presented to chiropractor Brian Hassinger, D.C., twice in 2007; twice in 2009; and, three times in 2010.[2] (Tr. 272-275.) In November 2007, Dr. Hassinger noted continued lower back pain and stiffness, but stated that Schubert's "pain is tolerable [and] motion and function within the spine is improving and he is in much less pain than the previous [visit]." (Tr. 273.) In June 2009, Dr. Hassinger noted lower back pain and tightness but found "he is moving easier and there is less pain and stiffness." *Id*. By August 2010, Schubert reported he was "working out on a regular basis" and experiencing "tightness and discomfort but not severe pain." *Id*.

On January 15, 2012, Dr. Hassinger completed a Physical Residual Functional Capacity Assessment. (Tr. 369-370.) Therein, he offered that Schubert could lift and carry up to 10 pounds occasionally and less than 10 pounds frequently; could sit, stand, or walk for two hours each in an eight-hour workday; and, could occasionally reach, handle, finger, feel and push/pull.

---

[2] The record indicates Schubert continued to present to Dr. Hassinger in 2011 and 2012. (Tr. 274-276, 367.) However, as these visits are well past Schubert's June 2009 date last insured, the Court will not discuss this evidence.

*Id.* Dr. Hassinger also concluded Schubert could stand for fifteen minutes before changing position; would need to alternate sitting, standing or walking every fifteen minutes; and, would need the opportunity to shift positions at will from sitting or standing/walking.  (Tr. 369.) Finally, Dr. Hassinger opined Schubert's impairments or treatment would cause him to be absent from work more than three times per month.[3]  (Tr. 370.)

*Hearing Testimony*

During the February 9, 2012 hearing, Schubert testified as follows:

- He first experienced back pain in 1996.  He could not recall any specific incident that caused it.  He obtained treatment for this condition in 1997.  He took six months off work, lost weight, and participated in physical therapy.  He started to feel better, but the "sharp pain" came back.  (Tr. 50.)

- Prior to his onset date, he drove a small truck for his brother's trucking company "on and off."  In this job, he was seated 75% of the time and lifted, at most, 15 to 20 pounds.  He also worked as a tractor-trailer driver, for which he lifted at most 20 to 25 pounds.  He had to leave these jobs because of his back pain.  (Tr. 42-45.)

- In 2001, he opened his own auto dealership.  In this job, he was on his feet 25% of the time, and the heaviest he lifted was 15 to 20 pounds.  He had to stop this job because it hurt his back to sit at a desk.  (Tr. 41-43.)

- Between 2004 and 2006, he worked as a part-time delivery person.  In this job, he was on his feet 15 to 20% of the time.  He worked eight hours/day for three days/week, delivering edible arrangements that weighed approximately 7 to 8 pounds.  He left this job because "it got to be unbearable on his back." He had difficulty carrying the arrangements and driving the delivery van.  (Tr. 39-41, 51.)

- Between 2006 and 2009, he could be on his feet for five minutes at a time. He would experience a sharp pain along his belt line and have to sit down and rest. He wore a back brace during this time, but was still only able to stand for five minutes at a time.  Walking was not as painful as standing.  He could walk about a half a mile before needing to rest.  He had some difficulty sleeping because of the pain.  He never slept more than two to three hours at a time.  (Tr. 52-56.)

- Between 2006 and 2009, he was living with his mother.  He could do some light

---

[3]  The record also contains medical source statements from Dr. Silverman and state agency physician Jerry McCloud, M.D.  (Tr. 83-84, 260-264.)  On July 7, 2011, Dr. Silverman completed a medical questionnaire, in which he stated that Schubert was not capable of "lifting or prolonged standing (over 5 minutes)."  (Tr. 261.)  Dr. Silverman noted Schubert's symptoms had persisted since 1997.  (Tr. 262.)  On September 12, 2011, Dr. McCloud found there was insufficient evidence to determine the severity of Schubert's conditions during the time period between his onset date (September 30, 2006) and his date last insured (June 30, 2009).  (Tr. 84.)

5

>  house cleaning and yard work.  He was not able to shovel or rake, but could mow the lawn if he went slowly.  He had no difficulty dressing, showering, or managing his personal care.  He had no issues driving a regular car.  The longest driving trip he took during this time period was 15 to 20 miles.  (Tr. 54, 57, 62.)

- About once a month, he would experience a flare-up, which he described as a sharp, hot, burning pain accompanied by muscle spasms.  When he had a flare up, he went to see the chiropractor.  He also used ice, Aleve, and Voltaren.  After experiencing a flare up, he could not mow the lawn.  The pain took "a few days to settle down."  (Tr. 51-52, 57-58.)

- Between 2006 and 2009, he tried home exercises recommended by his doctors.  He "kept the weight off," and did light sit ups and arm extensions.  It seemed to help loosen things up.  (Tr. 56-57.)

The VE testified Schubert had past relevant work as a delivery driver (medium, semi-skilled, SVP 3); heavy truck driver (medium, semi-skilled, SVP 4); tow motor operator (medium/light, semi-skilled, SVP 3); auto dealer manager (light, skilled, SVP 7); and, auto salesperson (light, skilled, SVP 6).  (Tr. 65-66.)  The ALJ then posed the following hypothetical:

>  My first hypothetical question.  I'd like you to consider a person with the same age, education, and past work as the claimant who is able to occasionally lift 50 pounds and frequently lift 25 pounds; is able to stand and walk six hours of an eight-hour work day; is able to sit for six hours of an eight-hour work day; would have unlimited push and pull.  Would this hypothetical individual be able to perform the claimant's past relevant work as those occupations are generally performed in the national economy?

(Tr. 67.)  The VE testified such an individual could perform Schubert's past relevant work, both as generally performed in the national economy and as he actually performed it.  (Tr. 67.)  The ALJ then added the additional limitation that "this hypothetical individual can frequently handle, finger, and feel and occasionally reach overhead." (Tr. 68.)  The VE testified such an individual would still be able to perform Schubert's past relevant work.  (Tr. 68.)  Finally, the ALJ added the further limitation that the hypothetical individual would be absent from work approximately three times a month.  (Tr. 68.)  The VE testified such an individual would not be able to work.  (Tr. 68-69.)

The ALJ then posed a second hypothetical as follows:

>  I'd like you to consider a person with the same age, education, and past work as the claimant who is able to occasionally lift 20 pounds and frequently lift 10 pounds; is able to stand and walk six hours out of an eight-hour work day; is able to sit for six hours out of an eight-hour work day; and would have unlimited push and pull.  Would this hypothetical individual be able to perform the claimant's past relevant work as those occupations are generally performed in the national

6

economy?

(Tr. 69.) The VE testified such an individual could perform Schubert's past relevant work as an auto dealer manager and auto salesperson. (Tr. 69.) In addition, the VE stated such an individual could also perform the following other jobs: wire worker; electronics worker; and, bench assembler. (Tr. 69-70.) The ALJ then added the additional limitation that "this hypothetical individual can frequently handle, finger, and feel, and occasionally reach overhead." (Tr. 70.) The VE testified such an individual would still be able to perform Schubert's past relevant work as an auto dealer manager and auto salesperson, as well as the wire worker; electronics worker; and bench assembler jobs. (Tr. 70.) Finally, the ALJ added the further limitation that the hypothetical individual would be absent from work approximately three times a month. (Tr. 70.) The VE testified such an individual would not be employable. (Tr. 70-71.)

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[4]

---

[4] The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Schubert was insured on his alleged disability onset date, September 30, 2006, and acquired sufficient quarters of coverage to remain insured through June 30, 2009. (Tr. 17.) Therefore, in order to be entitled to POD and DIB, Schubert must establish a continuous twelve month period of disability commencing between those dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. Summary of Commissioner's Decision

The ALJ found Schubert established medically determinable, severe impairments, due to degenerative disc disease, arthritis, and a substance addiction disorder; however, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 19-20.) Schubert was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work. (Tr. 20-22.) The ALJ found Schubert was capable of performing his past relevant work as an auto dealer manager and auto salesperson. (Tr. 22.) Using the Medical Vocational Guidelines ("the grid") as a framework and VE testimony, the ALJ also concluded there were other jobs existing in the national economy that Schubert could perform. (Tr. 22-23.) Accordingly, the ALJ determined Schubert was not disabled at any time between his alleged onset date and date last insured; i.e. between September 30, 2006 and June 30, 2009. (Tr. 24.).

### V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence

8

has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.*

9

*Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

### VI.  Analysis

*RFC Assessment*

In his sole assignment of error, Schubert argues the ALJ's RFC assessment is "wholly unsupported by the record." (Doc. No. 14 at 5.)  He maintains the results of his 1997 and 2001 MRIs fully corroborate the severity of his degenerative disc disease. *Id*. at 7.  He also argues the ALJ improperly minimized physical examination findings of stiffness, muscle spasm and reduced range of motion, asserting these symptoms "hardly correlate with the ability to stand for six hours in an eight hour work day, or lift 20 pounds occasionally and 10 pounds frequently." *Id*.  Schubert goes on complain that the ALJ ignored his March 2010 cervical x-ray and incorrectly found he did not report back pain to Dr. Silverman during the relevant time period. He further asserts the ALJ erred in relying on his daily activities to support the RFC, stating those activities do not demonstrate he is capable of significant standing.  Finally, Schubert argues the ALJ improperly discounted the chiropractic care he received from Dr. Hassinger and, further, failed to properly evaluate Dr. Hassinger's physical RFC assessment.

As an initial matter, the Commissioner argues the ALJ was "solely obliged to acknowledge and consider the medical evidence during the relevant time period."  (Doc. No. 15 at 11-12.)   She maintains both the objective medical results and physical examination findings during the relevant time frame fully support the conclusion that Schubert could perform a limited range of light work.  The Commissioner also emphasizes Schubert's extensive daily activities and the fact he did not seek any medical treatment for his impairments during 2008. Finally, the Commissioner argues the ALJ properly accorded little weight to Dr. Hassinger's opinion.

A claimant's RFC is the most that he can still do despite his functional limitations.  20 C.F.R. § 404.154(a); SSR 96-8p.  The assessment must be based upon all of the relevant evidence, including the medical records and medical source opinions.  20 C.F.R. § 404.1546(c).

The final responsibility for deciding the RFC "is reserved to the Commissioner." 20 C.F.R. § 404.1527(e)(2). While this Court reviews the entire administrative record, it "does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)). *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is *not* the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.") Indeed, the Sixth Circuit has repeatedly upheld ALJ decisions where medical opinion testimony was rejected and the RFC was determined based upon objective medical and non-medical evidence. *See e.g., Ford v. Comm'r of Soc. Sec.*, 2004 WL 2567650 (6th Cir. Nov. 10, 2004); *Poe v. Comm'r of Soc. Sec.*, 2009 WL 2514058 (6th Cir. Aug. 18, 2009). "[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe*, 2009 WL 2514058 at * 7.

Here, the ALJ thoroughly considered the medical evidence regarding Schubert's degenerative disc disease. (Tr. 21-22.) She first found that "the objective findings discovered between his alleged onset date and date last insured were inconsistent with his allegations regarding the severity of his symptoms." (Tr. 21.) In this regard, she discussed the 2001 MRIs of Schubert's lumbar and cervical spine; noted that "examinations performed during the period under adjudication simply revealed stiffness, muscle spasms, and an improving range of motion;" and, observed that Schubert did not complain to Dr. Silverman about his back pain during the relevant time period. *Id.* The ALJ next determined that Schubert did not "receive the type of treatment one would expect for a totally disabled person." *Id.* Specifically, the decision notes that "[b]etween his alleged onset date and date last insured, [Schubert] simply participated in chiropractic care." *Id.* The ALJ also relied on Schubert's testimony that he was able to complete 40 hours of community service, as well as attend church and Alcoholics Anonymous meetings both of which "require significant sitting." *Id.* Finally, the ALJ accorded little weight

to Dr. Hassinger's opinion, finding "[n]ot only is this assessment inconsistent with the objective findings, but as a chiropractor, Dr. Hassinger is not an acceptable medical source."  (Tr. 22.)

The ALJ formulated Schubert's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform less than a full range of light work as defined in 20 CFR 404.1567(b). Specifically, the claimant can lift or carry up to 20 pounds occasionally and 10 pounds frequently, can sit, stand or walk for six hours of an eight-hour workday, and can perform unlimited pushing and pulling.

(Tr. 20.)

The Court rejects Schubert's argument that the RFC is not supported by substantial evidence.  Although well prior to Schubert's September 2006 onset date, the ALJ acknowledged the results of the 2001 MRIs of Schubert's lumbar and thoracic spine, including the fact that the lumbar MRI documented multilevel disc disease, bulging, and herniations.  (Tr. 21.)  However, the ALJ went on to observe that, subsequent to these MRIs and during the period under adjudication, Schubert's physical examinations reflected only general complaints of stiffness and muscle spasms, and not severe back pain.  This observation is generally supported by the treatment notes of Dr. Brayer and Dr. Hassinger, which indicate conservative care and gradual improvement during the relevant time period.  Moreover, despite the fact Schubert presented to Dr. Silverman on numerous occasions between September 2006 and June 2009, the parties do not direct this Court's attention to any of Dr. Silverman's treatment notes during this time period indicating that Schubert once complained of back pain.

Schubert argues the ALJ improperly failed to acknowledge medical evidence that fell outside of the time period between his September 2006 onset date and June 2009 date last insured ("DLI").  Specifically, Schubert maintains the RFC is not supported by substantial evidence in light of the 1997 MRI results; March 2003 and March 2010 treatment notes from Dr. Silverman; and, March 2010 cervical spine x-ray.  Schubert cites no law in support of his position that the ALJ was required to consider this evidence under the circumstances presented herein.  Indeed, district courts within this Circuit have held that "as a general rule, the only medical evidence relevant to the issue of disability is that medical evidence dealing with a

claimant's condition during the period of insured status." *Forshee v. Comm'r of Soc. Sec.*, 2012 WL 1672974 at * 8 (E.D. Mich. April 11, 2012). *See also Carter v. Comm'r of Soc. Sec.*, 2013 WL 3940874 at * 6 (N.D. Ohio July 30, 2013).

That being said, the Court finds the pre-onset date evidence cited by Schubert is not inconsistent with the RFC. The September 1997 MRI predates the onset date by nine years, rendering its probative value questionable at best. Moreover, as discussed above, the physical examinations and treatment history subsequent to this MRI support the ALJ's determination that Schubert was capable of a limited range of light work during the relevant time period. With respect to Dr. Silverman's March 2003 treatment notes, they contain only one brief notation regarding Schubert's back pain ("chronic stiff LB-DJD. Had to give up truck driving"). (Tr. 326.) No further mention of Schubert's back pain is contained in the notes until October 2004, when Dr. Silverman reported "mild" lower back pain and referred Schubert to Dr. Epstein. (Tr. 322.) When Schubert presented to Dr. Epstein, he rated his back pain as a 1 on a scale of 10. (Tr. 194.) Dr. Epstein recommended Schubert continue his present pain medications and felt only a yearly follow-up visit was necessary. (Tr. 194-195.) Notwithstanding Schubert's argument to the contrary, the Court cannot say these records are "wholly contradictory" to the RFC.

The Court reaches a similar conclusion with respect to the post-DLI evidence cited by Schubert; i.e. Dr. Silverman's treatment notes and cervical spine x-ray dated March 2010. Although not cited by either party, "[m]edical evidence of a subsequent condition of health, reasonably proximate to a preceding time may be used to establish the existence of the same condition at the preceding time." *Begley v. Mathews*, 544 F.2d 1345, 1354 (6th Cir. 1976). However, when post-DLI evidence is relevant, "the date of that evidence is a factor to be considered in assigning relative weight to that evidence." *Sweitzer v. Astrue*, 2009 WL 3064665 at * 3 (E.D. Tenn. Sept. 23, 2009). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (finding that post-DLI evidence may be considered but a delay of two years renders that evidence "minimally probative"); *King v. Sec'y of Health & Human Svcs.*, 896 F.2d 204, 205-26 (6th Cir. 1990) (concluding that substantial evidence supported ALJ's finding that claimant was

13

not disabled by her "musculoskeletal difficulties" during her period of eligibility notwithstanding a diagnosis of degenerative disc disease six months after the DLI).

Here, Dr. Silverman's March 25, 2010 treatment notes contain a notation that Schubert complained of neck pain and indicate a diagnosis of "C-spine DJD and radiculopathy."  (Tr. 297.)  Although these notes are hand-written and somewhat difficult to read, it appears Dr. Silverman prescribed Vicodin and advised Schubert to take Aleve and Tylenol. *Id.* It also appears he ordered an x-ray of Schubert's cervical spine. (Tr. 363.) This x-ray (which was taken on March 25, 2010) found reversal of cervical lordosis; narrowing of the C6/C7 disc space; and, spurs off of C6. *Id*. As an initial matter, it is questionable whether these records relate back to the relevant period time as they are dated almost nine months after Schubert's DLI.  Even assuming they do relate back, the Court rejects Schubert's argument that they render the RFC unsupported by substantial evidence.  Neither Dr. Silverman's March 25, 2010 treatment notes or the cervical x-ray prescribe any functional limitations greater than that set forth in the RFC.  Moreover, the Court notes that, when Schubert next returned to Dr. Silverman on August 30, 2010, he reported "working out 7d/wk rec center & bike riding." (Tr. 296.)  This is consistent with Dr. Hassinger's August 13, 2010 treatment notes, which report that Schubert is "working out on a regular basis and there is . . .tightness and discomfort but not severe pain."[5] (Tr. 273.)  (Tr. 273.)  In light of the above, the Court finds that, even assuming the ALJ should have considered the 2010 treatment notes and x-ray, any such error was harmless as these records do not indicate Schubert has functional limitations greater than those set forth in the RFC.

The Court also rejects Schubert's argument that the ALJ improperly relied on his activities of daily living as support for her RFC assessment.  In her decision, the ALJ notes that

---

[5] Although Schubert cites treatment notes from 2011 and 2012 when recounting the medical evidence, he does not clearly argue that this evidence demonstrates the RFC is unsupported by substantial evidence.  The Court will not consider Schubert's medical records from 2011 and 2012 in connection with this assignment of error, as they are several years removed in time from his June 2009 DLI.

Schubert completed forty hours of community service, attended church and attended Alcoholics Anonymous meetings; and, further, that the latter two activities require "significant sitting." (Tr. 21.) Schubert argues these activities shed no light on his ability to stand and, therefore, do not support the RFC. However, as noted above, the ALJ relied on other evidence in crafting the RFC that is relevant to Schubert's ability to stand, including Schubert's physical examination findings, conservative treatment, and failure to complain about back pain to Dr. Silverman at any point during the relevant time period. The ALJ's observations regarding Schubert's daily living activities are, thus, just one factor in the RFC assessment.

Finally, the Court rejects Schubert's argument that the ALJ improperly assessed the medical opinion of Dr. Hassinger. (Doc. No. 14 at 8-9.) The ALJ addressed this opinion as follows:

> Moreover, little weight is also afforded to the January 15, 2012 opinion of Brian Hassinger D.C. According to him, the claimant can only lift and carry up to 10 pounds occasionally and less than 10 pounds frequently and can only sit, stand, or walk for two hours of an eight-hour workday, provided he change positions every 15 minutes and lies down when needed. Furthermore, he believes the claimant can only occasionally reach, handle, finger, feel, push and pull. Finally, in his opinion, the claimant will likely miss three or more days of work per month. (Exhibit 13F). Not only is this assessment inconsistent with the objective findings, but as a chiropractor, Dr. Hassinger is not an acceptable medical source.

(Tr. 22.) The ALJ also later notes that this opinion was "written years after the date last insured of June 30, 2009." *Id*.

Under Social Security regulations, only "acceptable medical sources" are considered "treating sources" whose opinions may be entitled to controlling weight. *See* 20 CFR §§ 404.1502/416.902, 404.1513(d)/416.913(d), and 404.1527(d)/416.927(d); Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939 at * 2 (Aug. 9, 2006). It is well-established that chiropractors, such as Dr. Hassinger, are not "acceptable medical sources*." See Walters v. Comm'r of Soc. Sec*., 127 F.3d 525, 530 (6th Cir. 1997); *Paddock v. Comm'r of Soc. Sec*., 2012 WL 4356711 at * 4 (W.D. Mich. Sept. 24, 2012); *Newsome v. Astrue*, 2010 WL 691285 at * 2 (S.D. Ohio February 24, 2010). Indeed, Schubert acknowledges that a chiropractor is an "other source" pursuant to 20 CFR §§ 404.1513(d)(1)/416.913(d)(1), which is neither entitled to controlling weight or subject to the "good reasons" requirement of the treating physician rule.

*See* SSR 06-03p, 2006 WL 2329939 at * 2; *Everett v. Comm'r of Soc. Sec.*, 2012 WL 3731388 at * 11 (S.D. Ohio Aug. 28, 2012).

Nonetheless, the Court recognizes that evidence from "other sources" should not be ignored. As explained in SSR 06-03p, information from "other sources" (such as chiropractors) is "important" and "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03P, 2006 WL 2329939 at * 2 -3 (Aug. 9, 2006). Interpreting this SSR, the Sixth Circuit has found that opinions from "other sources" who have seen the claimant in their professional capacity "should be evaluated using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion." *See Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 541 (6th Cir. 2007).

The Court finds the ALJ herein properly evaluated Dr. Hassinger's opinion. The ALJ acknowledged that Dr. Hassinger treated Schubert during the relevant time period and summarized his examination findings.[6] (Tr. 21) In addition, the ALJ indicated that she found Dr. Hassinger's opinions to be inconsistent with the objective findings, which are set out and discussed earlier in the decision. Finally, the ALJ noted the fact that Dr. Hassinger's opinion was written in January 2012, nearly two and a half years after Schubert's DLI. In light of the above, the Court finds the ALJ fully complied with the requirements of SSR 06-03p and, further, that her rejection of Dr. Hassinger's opinions is supported by substantial evidence.

Accordingly, and for all the reasons set forth above, the Court finds the RFC is supported by substantial evidence.

### VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence. Accordingly, the decision of the Commissioner should be AFFIRMED

---

[6] The ALJ specifically referenced Exhibit 8F, which are Dr. Hassinger's treatment notes. (Tr. 272-276.)

and judgment entered in favor of the defendant.

s/ Greg White<br>
United States Magistrate Judge

Date: May 6, 2014

### OBJECTIONS
**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order.** *See United States v. Walters*, **638 F.2d 947 (6th Cir. 1981).** *See also Thomas v. Arn*, **474 U.S. 140 (1985),** *reh'g denied*, **474 U.S. 1111 (1986).**